UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Frederick T. Rudolph,

        Plaintiff,

        v.

U.S. Bank National Association,

        Defendant.

**MEMORANDUM OPINION AND ORDER**
Civil No. 04-4581 ADM/JJG

_____

Marshall H. Tanick, Esq., and Andrew T. Jackola, Esq., Mansfield, Tanick & Cohen, P.A., Minneapolis, MN, argued for and on behalf of Plaintiff.

Mary L. Knoblauch, Esq., Anthony Ostlund & Baer, P.A., Minneapolis, MN, argued for and on behalf of Defendant.

_____

## I. INTRODUCTION

On March 7, 2006, oral argument before the undersigned United States District Judge was heard on Defendant U.S. Bank National Association's ("U.S. Bank" or "Defendant") Motion for Summary Judgment [Docket No. 37]. In his Amended Complaint ("Complaint") [Docket No. 1], Plaintiff Frederick T. Rudolph ("Rudolph" or "Plaintiff") alleges U.S. Bank violated the Minnesota Whistleblower Statute, interfered with his opportunity to acquire additional benefits in violation of the Employee Retirement Income Security Act ("ERISA"), and violated Minn. Stat. § 181.13. For the reasons set forth herein, Defendant's Motion for Summary Judgment is granted.

## II. BACKGROUND

Plaintiff Rudolph is a former employee of Defendant U.S. Bank, beginning his tenure at U.S. Bank in 1998 when U.S. Bank acquired Zapp Bank in St. Cloud, Minnesota. Rudolph Dep. (Knoblauch Aff. [Docket No. 42] Ex. 4) at 217; Christianson Dep. (Knoblauch Aff. Ex. 1) at 69.

At U.S. Bank, Rudolph held the position of Trust Relationship Manager in the Private Client Group. Rudolph Dep. at 12-13. This position was responsible for "[a]dherence to trust compliance process/procedures." Knoblauch Aff. Ex. 1. Rudolph was also the senior compliance officer for U.S. Bank's St. Cloud office. Rudolph Dep. at 49-50. Investment decisions for the accounts managed by the Private Client Group were made by asset management teams, or portfolio managers. Ims-Goin Dep. (Knoblauch Aff. Ex. 3) at 70-75. Rudolph's responsibilities did not include making investment decisions. Id.

While employed at U.S. Bank, Rudolph received mostly favorable performance reviews. Rudolph Dep. at 132-35, Knoblauch Aff. Exs. 17-19, 33-34. However, management also documented concerns with Rudolph's communication abilities. Knoblauch Aff. Exs. 13-15; Christianson Aff. [Docket No. 41] ¶¶ 3-5, 7, Exs. 1-3, 6. Rudolph's first manager, John Asfeld, addressed Rudolph's communication style with Rudolph. Rudolph Dep. at 224-27; Knoblauch Aff. Ex. 25; Christianson Aff. ¶ 3. Mark Christianson ("Christianson") also met with Rudolph after he became Rudolph's manager. Christianson Aff. ¶ 4, Ex.2; Christianson Dep. at 89-90. Rudolph's December 1999 performance review reflected a low rating for "inter-departmental behavior." Knoblauch Aff. Ex. 17; Rudolph Dep. at 130-31.

Christianson issued Rudolph a warning in March 2000. Christianson Aff. ¶ 5, Ex. 3; Knoblauch Aff. Exs. 14-15. The warning related to an incident on March 8, 2000, when Rudolph was involved in a loud telephone conversation with a woman employed in U.S. Bank's tax department. Rudolph Dep. at 101-02; 105; Knoblauch Aff. Exs. 13, 16. The woman reported being intimidated by Rudolph, and refused to work with him following the incident. Rudolph Dep. at 105, 109-10; Knoblauch Aff. Ex. 14; Christianson Dep. at 84, 93-94.

2

Christianson's warning to Rudolph stated:

> Over the course of the past few months, there have been several complaints indicating that you have displayed behavior that is hostile, and intimidating in nature. This behavior includes loud, unpredictable verbal outbursts, rude and disrespectful verbal bashing, and judgmental remarks regarding job performance. Most of these interactions with individuals have not only occurred in the work area, but have been overheard by other employees. . . . Any further incidents of this behavior will result in additional disciplinary action up to and including termination.

Knoblauch Aff. Ex. 14. Christianson and Rudolph later discussed the details of the incident. Rudolph Dep. at 118; Knoblauch Aff. Exs. 15-16.

The crux of the March 2000 incident was a disagreement Rudolph had with U.S. Bank over tax treatment given to capital gains. Rudolph Dep. at 98. While at Zapp Bank, Rudolph oversaw a procedure by which the bank "passed through" capital gains to a trust beneficiary so that the beneficiary could offset the capital gains with charitable contributions. As a result, the beneficiary did not have to pay additional income taxes. Rudolph Dep. at 94-103. However, after U.S. Bank acquired Zapp Bank, it initially did not pass through the capital gains to the beneficiary. Rudolph argued this policy hurt the beneficiaries. Id. at 95. This resulted in the March 8, 2000 telephone dispute between Rudolph and the tax department. Ultimately, however, U.S. Bank chose to adopt Rudolph's approach. Id. at 102-03, 106-07.

Another dispute between Rudolph and U.S. Bank arose in 2003. Rudolph was serving as the Trust Relationship Manager on an account held by National Lead Industries ("NL Industries"). Id. at 22-23. When the NL Industries account was established, U.S. Bank and NL Industries negotiated the fees for the trust account, which included payment to U.S. Bank of 30 basis points for non-U.S. Bank owned mutual funds or other investments, and 10 basis points for U.S. Bank's First American Funds. Id. at 23, 31-32; Knoblauch Aff. Ex. 10; Christianson Dep.

at 104-06. In December 2002, Rudolph informed Christianson that he believed it was no longer financially beneficial to NL Industries to be invested in First American Funds. Rudolph Dep. at 22. Rudolph, without approval from the asset management team, began transferring funds in February 2003. Id. at 18, 38. Christianson, after learning of Rudolph's transfers, told Rudolph the asset management team would review the investment. Id. at 19, 38. During the review period, Rudolph sent Christianson an email stating:

> When are we going to get an answer to the question, What Money Market Fund is best for NL?
>
> I want to quote from the Prudent Investors Act.
>
> Section 5, Loyalty. "A trustee shall invest and manage the trust assets solely in the interest of the beneficiaries."
>
> I am very concerned with the decision making process of the investment area. They seem to only review the fee impact with the change to a non-FAF money market. . . .
>
> Please advise. I am concerned with the considerations I am being asked to make regarding NL's investments and fee structure.

Knoblauch Aff. Ex. 8; Rudolph Dep. at 26. The precise difference in savings to the NL Industries trust account by agreeing to Rudolph's suggestion is disputed by the parties, but both agree it could amount to a few thousand dollars a year on a seventeen million dollar account. Ultimately, the asset management team chose not to change the investments of the NL Industries account. Christianson Dep. at 193-94.

In early 2003, Christianson asked Rudolph to participate on the management committee of the St. Cloud U.S. Bank office. Rudolph Dep. at 43, 48. Rudolph did so, but resigned from the committee in the spring of 2003 after Christianson became upset with him for leaving work early one day following a power outage. Id. at 43-45. At Christianson's request, Rudolph

agreed to continue as the compliance officer. Id. at 45-46, 146-47. Also in the spring of 2003, Rudolph applied to the Board of Junior Achievement of the Upper Midwest. Id. at 19-21. Christianson, however, told him he could not participate on the board, and later told Rudolph he could not take time off during the day to attend Junior Achievement classroom activities. Id.

On September 23, 2003, Rudolph met with Christianson and another trust relationship manager. During the meeting, Rudolph asserted changes to asset management had previously been attempted, and stated that "[i]t didn't work then, and . . . it's not going to work now." Id. at 67-68, 74-76. Christianson responded "If you can't give up your history, you may as well clean out your desk and leave." Id. at 68. Rudolph replied, "Mark, I'm going to accept your firing of me," and left to clean out his office. Id. Christianson followed Rudolph, repeating to him that he had not, in fact, been fired. Id. at 68, 193-94. As Rudolph attempted to leave his office, Christianson grabbed Rudolph's shoulders. Id. at 65-66; Ims-Goin Dep. at 79-81. Rudolph told Christianson to "Take your hands off of me," an instruction with which Christianson complied. Rudolph Dep. at 66.

Both Rudolph and Christianson contacted a human resources generalist, Stephanie Ims-Goin, ("Ims-Goin") after the incident. Ims-Goin Dep. at 13, 63-67. Ims-Goin has testified that Rudolph insisted Christianson had terminated his employment. Id. at 78, 81-82. Ims-Goin assured Rudolph that he had not been terminated, and that he should return to work the next day or U.S. Bank would consider that he had abandoned his job. Rudolph Dep. at 69. Rudolph also told Ims-Goin that he nearly became violent, and that Christianson had almost guaranteed himself "a busted jaw." Ims-Goin Dep. at 63, 138; Rudolph Dep. at 58-59. That same evening, Rudolph sent an email to Ims-Goin and Bob Engebretsen ("Engebretsen"), the regional manager

5

for the St. Cloud office, which stated in part:

> I want to make you aware of one other fact. I came very close to becoming violent with your manager in St. Cloud. When he grabbed me, my response is to attack. This is not out of anger or even dislike but rather training. I don't want to hurt anyone or anything. When Mark physically grabbed me I came very close to responding to him and probably going to jail. I cannot continue to do my job in this situation. I am formally requesting a upper management review of the situation in St. Cloud and if it is found that I am at fault, I expect to be formally terminated. . . .
>
> I need a work environment that I can be assured that it is safe from not only violence toward me but not creating a situation that will force me to be violent.

Knoblauch Aff. Ex. 7; Rudolph Dep. at 14-15. In his deposition testimony, Rudolph stated that if Christianson had not removed his hands from him, "he would be in tougher shape than I am. I'm a larger person, and I had – I do have Marine Corps military training. That's what I was saying in that e-mail, I will defend myself." Rudolph Dep. at 54-55.

Rudolph returned to work on September 24, 2003, the day after the incident. Id. at 193. Christianson reported his fear of Rudolph to Ims-Goin. Ims-Goin Dep. at 135-36. After consulting with Engebretsen, Ims-Goin scheduled a meeting with Rudolph the following day in the St. Cloud office. Id. at 85-87, 92-93. During that meeting, which was held in a conference room, Ims-Goin stationed a security guard in a portion of the room not visible to Rudolph and Ims-Goin. Id. at 92-94, 127; Rudolph Dep. at 61. However, when Ims-Goin took a break to make a phone call, Rudolph observed the security guard. According to Rudolph, when the meeting resumed, he remarked to Ims-Goin, "Nice touch." Rudolph Dep. at 60-61. Ims-Goin and Rudolph then began discussing the Workplace Violence Policy. Ims-Goin Dep. at 104. Both Ims-Goin and Rudolph described this portion of the meeting as tense. Id. at 127; Rudolph Dep. at 63.

Following the meeting with Rudolph, Ims-Goin reviewed the March 2000 written

6

warning and other documentation regarding Rudolph's communication problems. Ims-Goin Dep. at 48-49, 57-58, 99-100. After discussing the situation with her manager and an employee relations representative, Ims-Goin scheduled an October 6, 2003 meeting with Engebretsen and Christianson. Id. at 100, 115, 119-20. At the meeting, Ims-Goin recommended terminating Rudolph. Id. at 124-28, 137-39; Engebretsen Dep. (Knoblauch Aff. Ex 2) at 69, 74-78. Christianson agreed with the recommendation. Engebretsen Dep. at 76-78. Engebretsen, basing his decision on the recommendations of Ims-Goin and Christianson as well as his own review of the situation, agreed. Id. On October 16, 2003, Engebretsen and Christianson met with Rudolph and advised him he was terminated. A security guard was present, and Ims-Goin participated in the meeting by telephone. Id. at 83; Ims-Goin Dep. at 130-31.

After the meeting, Ims-Goin sent a letter to Rudolph stating that he was terminated for violating the Workplace Violence Policy. Knoblauch Aff. Ex. 41. The letter referenced Rudolph's email to Engebretsen; the phone conversation between Ims-Goin and Rudolph in which he stated he nearly became violent with Christianson; her meeting with Rudolph in which, according to Ims-Goin, Rudolph stated it was a good idea to have a security guard present; and finally, the March 2000 written warning for hostile and intimidating behavior. Id. The U.S. Bank Workplace Violence Policy, which Rudolph testified he was familiar with, states:

> U.S. Bancorp is committed to providing a safe work environment. Threatening behavior by employees, customers or others will not be allowed. Such threatening behavior includes, but is not limited to, any action, word or use of an object that is intended to harm or intimidate or which has the effect of harming or intimidating another person.

Knoblauch Aff. Ex. 6 at 35; Rudolph Dep. at 14.

## III. DISCUSSION

**A.     Standard of Review**

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall issue "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On a motion for summary judgment, the Court views the evidence in the light most favorable to the nonmoving party. Ludwig v. Anderson, 54 F.3d 465, 470 (8th Cir. 1995). The nonmoving party may not "rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." Krenik v. County of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995).

**B.     Minnesota Whistleblower Statute**

Rudolph's first claim is predicated upon a violation of the Minnesota Whistleblower statute. Minn. Stat. § 181.932 states that an employee who, in "good faith, reports a violation or suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official" is protected from retaliation. Minnesota courts analyze whistleblower claims under the McDonnell Douglas test. Cokley v. City of Otsego, 623 N.W.2d 625, 630 (Minn. Ct. App. 2001). Under the McDonnell Douglas framework, "the employee has the initial burden to establish a prima facie case, and the burden of production then shifts to the employer to articulate a legitimate, non-retaliatory reason for its

action, after which the employee may demonstrate that the employer's articulated reasons are pretextual." Id., citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973). A prima facie case under Minn. Stat. § 181.932 is demonstrated if a plaintiff can show: "(1) statutorily-protected conduct by the employee; (2) adverse employment action by the employer; and (3) a causal connection between the two." Id., quoting Hubbard v. United Press Int'l, Inc., 220 N.W.2d 428, 444 (Minn. 1983).

     Rudolph claims he twice participated in protected conduct, first when he informed U.S. Bank that its tax treatment of capital gains in 2000 was improper, and second, when he sent the February 20, 2003 email to Christianson quoting the Uniform Prudent Investor Act. However, neither incident concerns a suspected violation of law. The first incident involving tax treatment of capital gains related to trusts centers on Rudolph's contention that U.S. Bank's method was not the most cost-effective to clients. There is no authority to suggest that U.S. Bank's method was illegal or a violation of tax law. Rudolph admitted in his deposition that he was not aware that any tax law had been broken. Rudolph Dep. at 98. Even if this were the case, or if U.S. Bank had somehow violated its fiduciary duty to the trustee, Rudolph's case is undermined because U.S. Bank ultimately agreed with Rudolph's analysis and adopted his suggestion. Additionally, Rudolph can not demonstrate any adverse action that occurred as a result of voicing his concerns. The only consequence of the incident was a written warning Rudolph received regarding the loud, intimidating manner of his conversations with the tax department that may have been overheard by other employees. Knoblauch Aff. Ex. 14. Nothing regarding the substance of Rudolph's communications with the tax department was cited. Id. Rudolph can not demonstrate a prima facie whistleblower violation because he has not shown a violation of

law or an adverse action against him.

With respect to Rudolph's claim involving the NL Industries account, Rudolph alleges he informed U.S. Bank that it was violating the Uniform Prudent Investor Act.  As a threshold matter, the NL Industries account is covered by New York law, which does not include the Uniform Prudent Investor Act.  However, the New York Prudent Investor Act does require trustees to fulfill its fiduciary duties to the beneficiaries of the trust.  N.Y. EPTL § 11-2.3.  Even given the benefit of this doubt, Rudolph has failed to demonstrate a violation of the law.  The issue presented to U.S. Bank by Rudolph involved an investment decision that was clearly a matter of judgment, not one of law.  Rudolph argued that moving the monies in the NL Industries account out of the First American Funds would increase the value of the account.  While this may have been demonstrably true in the short run, it is not clear that the gains would continued indefinitely.  As with all investments, mutual funds are subject to fluctuations based on a host of factors.  Consequently, it can not be said that a violation of fiduciary duty occurs every time an investor elects to buy or hold an investment when an alternate investment might potentially profit a beneficiary in the short term.

Again, even if Rudolph could demonstrate that he reported a violation of law, he can not demonstrate a causal connection between that report and any adverse action taken against him.  The bulk of Rudolph's alleged adverse actions are not supported by authority.  Rudolph claims U.S. Bank's refusal to allow him to join the board of Junior Achievement or participate in Junior Achievement meetings during workday hours are adverse actions.  This is insufficient, however, to constitute an adverse action as a matter of law.  "An adverse employment action is a tangible change in working conditions that produces a material employment disadvantage. . . .

Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not." Sallis v. Univ. of Minn., 408 F.3d 470, 476 (8th Cir. 2005).

Rudolph's termination in October 2003 is clearly a recognized adverse action. Id. Rudolph can not, however, demonstrate that the termination was causally related to his email in February 2003. Although Rudolph contends the termination was borne out of the incident regarding the NL Industries trust, there is no evidence in the record to connect the two events. First, Rudolph was terminated eight months after he sent the email in question. As the Eighth Circuit has held, "long intervals between the conduct that is said to motivate an employer and the adverse employment decision complained of tend to undermine the inference that the discharge was retaliatory." Minn. Ass'n of Nurse Anesthetists v. United Hosp., 59 F.3d 80, 83 (8th Cir. 1995). Additionally, Rudolph has not been able to proffer evidence that Engebretsen, the final decision maker on his termination, was aware of the February 2003 email which Rudolph claims was protected activity. At least one other circuit has found that if a decisionmaker is unaware of the alleged protected activity, an inference of retaliation is barred. Alexander v. Wis. Dept. of Health & Family Servs., 263 F.3d 673, 688 (7th Cir. 2001).

Even if Rudolph were able to demonstrate a prima facie case that he was retaliated against for participating in protected activity, U.S. Bank has proffered a legitimate, non-retaliatory reason for his termination. U.S. Bank set forth its reasoning in the termination letter as: the email Rudolph authored to Engebretsen, in which he indicated that he nearly became violent with Christianson; the phone conversation between Rudolph and Ims-Goin in which

11

Rudolph repeated that same thought; Ims-Goin's meeting with Rudolph, in which she was concerned for her safety; and the March 2000 written warning to Rudolph concerning his behavior. Knoblauch Aff. Ex. 41. These actions were in direct violation of the U.S. Bank violence in the workplace policy, which states that "Threatening behavior by employees, customers or others will not be allowed. Such threatening behavior includes, but is not limited to, any action, word or use of an object that is intended to harm or intimidate or which has the effect of harming or intimidating another person." Knoblauch Aff. Ex. 6 at 35.

Rudolph's actions violated U.S. Bank policy. Although Rudolph counters that Christianson grabbed him by the shoulders in Rudolph's office, Rudolph has not alleged that this behavior was intimidating to him. However, his response to Christianson's actions made, at a minimum, Christianson and Ims-Goin concerned for their safety. As a result, U.S. Bank performed an investigation of Rudolph's actions, and ultimately terminated him. No evidence has been proffered to suggest that U.S. Bank's stated reason for the termination of Rudolph was a subterfuge for his termination. Consequently, even if Rudolph had presented a prima facie case of a whistleblower violation, U.S. Bank's stated reasons for his termination requires granting U.S. Bank's Motion on this count.

**C.    ERISA Claim**

Rudolph's next claim avers that U.S. Bank violated § 510 of ERISA because, had Rudolph remained employed with U.S. Bank for six months beyond his termination, he would have qualified for additional benefits. Section 510 violations are also analyzed under the McDonnell Douglas framework. Eckelkamp v. Beste, 315 F.3d 863, 871 (8th Cir. 2002). To establish a prima facie case of a § 510 violation, a plaintiff must "demonstrate a causal

12

connection between the likelihood of future benefits and an adverse employment action." Kinkead v. Southwestern Bell Tel. Co., 49 F.3d 454, 457 (8th Cir. 1995).

First, the only proffered connection between Rudolph's termination and likelihood of future benefits is the fact that Rudolph was terminated six months before he turned fifty-five years of age. Furthermore, Rudolph was vested in the U.S. Bank pension plan. Smith Aff. [Docket No. 43] ¶ 7. Where a vested employee is denied only the chance to accrue more benefits, a § 510 claim does not lie. Corum v. Farm Credit Servs., 628 F. Supp. 707, 718 (D. Minn. 1986). Here, Rudolph claims that he would have been eligible for "health care credits." However, Rudolph has offered no evidence to rebut U.S. Bank's contention that the credits in question are not tied to the age of fifty-five. Smith Aff. ¶ 5, Ex. A. Because Rudolph can not demonstrate a causal connection between his termination and the likelihood that he would have received additional benefits, his § 510 claim must be denied and U.S. Bank's Motion granted.

Were Rudolph able to demonstrate a prima facie § 510 claim, his claim still could not survive because U.S. Bank has offered a legitimate, non-discriminatory reason for terminating him. As previously detailed, U.S. Bank terminated Rudolph under U.S. Bank's violence in the workplace policy.

**D.     Minn. Stat. § 181.13 Claim**

Rudolph's final claim is made under Minn. Stat. § 181.13, which states in part: "When any employer employing labor within this state discharges an employee, the wages or commissions actually earned and unpaid at the time of the discharge are immediately due and payable upon demand of the employee." Rudolph claims U.S. Bank failed to pay him $3,643.08 in incentive payments and $274.24 in expenses.

For purposes of determining whether wages were "actually earned," Minnesota courts turn to an employer's incentive plan to determine whether the employee earned the pay prior to termination. Holman v. CPT Corp., 457 N.W.2d 740, 743 (Minn. Ct. App. 1990). U.S. Bank's incentive plan states that "Awards are considered as earned by the participant on the date of actual distribution." Knoblauch Aff. Ex. 32 at 4. Additionally, a participant must be a U.S. Bank employee in good standing in order to participate in the incentive program. Id. at 1. Finally, the incentive plan states that "[i]n the event a participant's employment is involuntarily terminated for reasons other than position elimination, no award is paid." Id. at 4. The language of the incentive program supports that incentive pay was not earned by Rudolph at the time of termination. As a result, U.S. Bank's Motion is granted with respect to Rudolph's claim for incentive pay.

In regard to the allegedly unreimbursed expenses, U.S. Bank argues that unreimbursed expenses do not fall under "wages" as defined by Minn. Stat. § 181.13. Recently, it was held that unreimbursed expenses do not fall under the definition of "wages" in this context. U.S. Foodservice, Inc. v. Rezac, No. 04-4548, 2005 WL 1661529, at *2 (D. Minn. July 15, 2005). That case found that expenses do not fall under the definition of wages set forth in Minn. Stat. § 181.66, which may reasonably be assumed to define wages for this statute. As a result, U.S. Bank's Motion is granted.

## IV. CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that Defendant U.S. Bank National Association's Motion for Summary Judgment [Docket No. 37] is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


       s/Ann D. Montgomery
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  June 2, 2006.